The Chancellor.
This is an injunction bill. Its object is to prevent the defendants from encroaching, with a building they are erecting, upon an alley way upon which the defendants are the owners of a house and lot. This alley is in the borough of Bordentown, running from Main to Second street, a distance of four hundred and twenty-two feet. Both parties claim under John Miles, deceased. The complainants insist that the alley was dedicated by John Miles sixteen feet wide from Main to Second street. The defendants admit that Miles did open, and dedicate for public use, an alley from Main to Second street, but insist that the part of the alley towards Main street, to the depth of one hundred and fifty-three feet from that street, was opened to the width of eight feet only, and to that extent, only, dedicated by John Miles *501 to public use. This is the issue between the parties — the ■width of the alley to the depth of one hundred and fifty-three feet from Main street.
I would here remark, that the more fact of an individual’s encroaching upon the street by a building, does not confer upon every one owning a house upon the street a right to invoke the jurisdiction of this court to prevent the encroachment. The party who seeks redress here, in such a case, must show some special ground of equity; otherwise, every case where there is a dispute as to the boundary of a public street may be drawn into this court — a question not appropriate to this court, but one of law and fact, properly belonging to a court of law. Where the complaint is by an individual owning a neighboring lot, there the encroachment being a special damage to adjacent land owners, by obstructing their view or' access to the public highway, and in depreciating the value of their property, a case is presented where there is some special equity. The present case is one properly brought in this court. The complainants claim under a grantor, who dedicated this alloy to public use, and particularly for the benefit of the lots which ho laid out and sold along the alley. It is a fraud upon their grant for the grantor, or any one standing in his same rights towards the complainants, to shut up or obstruct the free use of the alley. Besides, this is not a public highway, which has been accepted as such by the public. I do not think, from any evidence in the cause, the public authorities could be charged with a neglect of duty for not repairing this -way. The public authorities are not bound to accept as a public highway, with all its responsibilities, every alley way of eight, or sixteen feet wide, ■which an individual chooses to open through his lands. There is no doubt but that the value of the complainants’ property is very materially affected by the width of this alley. They hold under John Miles, and they allege that he opened the alley, and that he received a consideration for this lot with a special reference to the width of the alley. There *502 is no covenant in their deed that the alley should be opened sixteen feet. They cannot maintain an action at law upon their deed for a breach of covenant. They may, therefore, properly seek redress in this court upon their equities. The right of the complainants to have this alley kept open to the width of sixteen feet, if any such right exists, is an equitable right, arising from the terms of the grant, in connection with the situation and nature of the property granted.
In 1807, John Miles became the owner of the plot of ground lying between Main and Second street. In 1882, he erected a brick building on Main street, which is still standing. On Main street, on the south, Miles was bounded by what is designated, by all the evidence, as the Burns lot. This lot bounded Miles, for one hundred and fifty-three feet, on a line at right angles with Main street. The boundary line of the two properties then runs off south on a line parallel with Main street; so that the Burns lot was taken off of the southeasterly corner of the plot, cutting a lot out of it one hundred and fifty-three feet deep. About the year 1842, Miles opened the alley. The brick house, he had built, formed the north corner of the alley on Main street. The Burns lot was on the opposite corner. The open space was just eight feet. The Burns lot, running easterly for one hundred and fifty-three feet, formed, for that distance, the south side of the alley. Bor the remaining distance to Second street, Miles’ land lies on both sides of the alley. The brick house formed the north side of the alley for twenty feet. On a line with the brick house, and twenty-one feet from it, was a smokehouse. A few feet further east was an ice-house. The smoke-house extended ten feet, and the ice-house fifteen feet, along the alley; so that forty-five feet of the alley, on Miles’ side, opposite Burns’ land, was built upon. It is on the twenty-one feet, lying between the brick house and the smoke-house, that the defendants are erecting their building.
*503 Miles had a map made of the premises, which according to the evidence of Mrs. Miles, was made prior to the year 1832. I think the evidence of Mrs. Miles, as to the time when the map was made, is corroborated by the circumstance, that while the map purports to have all the buildings marked upon it, the brick house, which was built in 1832, is not noted. The ice-house and smokehouse are represented standing on the north line of the alley. The alley is delineated as eight feet in width its whole length, and running from Main street to Second street.
I have particularly selected and mentioned the foregoing facts, which have an important bearing upon the case, because they are clearly established by the evidence, and show the facts and circumstances respecting the alley, as they existed just prior to the time of the conveyance under which the complainants claim.
In October, 1844, Miles made a public sale of lots on this plot of ground, and at this sale, several lots were struck off to Olaypole and Higgins. On thethird of October, 1844, Miles and wife conveyed the lots to Olaypole and Higgins. It is under this deed that the complainants claim. There is no evidence to show that, at the time, or prior to the execution of this deed, Miles had done any act to change the width of the alley from eight feet, or to manifest an intention of making any alteration in its width. The moving of the fences, which is particularly testified to by William B. Bunting, Allen Reeder, and Thomas Thomson, and the converting of the barn into a dwelling, and the circumstances attending it, testified to by several witnesses, occurred more than two years after the first public sale in 1844. The bill does not allege that Miles did any act, prior to the year 1844, to change the width of the alley. The bill is particularly guarded in this respect, and also as to the time when Miles first declared his intention of widening the alley. It does not allege that, prior to that time, Miles had made any declarations *504 of his intention to make any alteration in the alley. The bill states that Miles opened the alley sixteen feet wide from Main street to Second street, removing a barn and the fences and other obstructions from said alley, excepting the brick house and the smoke and ice-house, which were temporarily left with the express understanding and promise that they should be removed. There is no time given when the alley was thus opened sixteen feet, or when the promise was made that the obstructions should be removed. This is a very significant omission, when viewed in connection with the facts I have referred to respecting the original width of the alley, and which were certainly known to the complainants, and yet not alluded to in the bill. The omission to state, in the bill, the actual circumstances as to the width of this alley, and the facts as they existed at the time of the execution of the deed, is an admission that they are difficult of an explanation consistent with the claim which the complain ants are endeavoring to establish. The bill goes on to state, that relying upon the acts and promises of John Miles, as to the width of the alley, many persons purchased lots from him. But the complainants do not allege that Claypole and Higgins, when they purchased, relied upon such acts, or any like promise. This confirms me in the impression I have of the evidence, that there is not an act or a declaration of Miles, proved to have been done or said prior to the third of October, 1844, respecting the widening of the alley. Upon reading the bill, no one would suppose that the alley, as originally laid out, was eight feet in width, and that the complainants relied upon being able to prove that it was altered from its original width to sixteen feet. They certainly intended to produce the impression that the original width of the alley was sixteen feet, obstructed only by the house and two small buildings. I have alluded to the frame of the bill, because this being an injunction bill, and sworn to, the' circumstance that it does not state the facts, which *505 constitute the real gravamen of the complainants’ case, as they really existed, is unfavorable to the complainants’ claim.
The complainants have undertaken to show that, on the 8d of October, 1844, the alley was in fact sixteen feet wide. They rely upon the deed from Miles to Claypole and Higgins to establish this fact in connection with the acts and declarations of Miles. As I have stated, there is no act, proved to have been done by Miles prior to that time, which shows that he made any dedication wider than the eight feet, or manifested any intention to that effect. No witness testifies to any declaration of such an intention prior to that time. The testimony of Claypole, one of the grantees, puts the matter at rest. He says no such declaration was made at the sale at which he purchased, and that he did not purchase with any such expectation. .Does the deed establish the fact ? The deed includes several lots within the same boundaries, without giving a description or the boundaries of the separate lots. The lots lie on both sides of the alley. The only mention that is made of the alley in the deed, is in giving one of the boundaries, as follows: “ thence parallel with Second and Main street, crossing a sixteen feet alley, called Miles alley." Such a mention of an alley in the deed raised no implied covenant on the part of the grantor to open an alley sixteen feet wide, or of any other width. Nor does it give to the grantee any claim, in equity, upon the grantor, to compel him to open such an alley. It is nothing more than a declaration on the parto of the grantor of the existence of such an alley, and resort must be had to other evidence to show the fact of its actual existence and of its width. Suppose the fact to have been, that there was no alley there of any kind' — where would the grantees have been entitled to have it located ? There is no location specified in the deed. Where there is no street or alley actually in existence, and no map by which its location can be ascertained, then the mere reference to an *506 alley or street amounts to nothing. But here was an alley actually located and in use. The deed calls it a sixteen feet alley, while in fact it was only eight feet wide. A court of equity cannot compel the grantor to widen the alley. On which side should it be widened ? or to what extent in length? If the grantee relied upon the use of a sixteen feet alley, he should have had a covenant in his deed to secure it.
But again. The complainants insist that John Miles promised and agreed to open the alley sixteen feet wide, and that he sold lots to individuals relying upon such promise and agreement, and that, afterwards, he executed his agreement by actually widening the alley.’ They insist that a court of equity should now enjoin him from closing up the alley to its original width.
The first question to be decided is — whether, admitting the proposition to be true — that equity ought to protect those who have purchased from John Miles under such circumstances — do the complainants occupy a position to entitle them to such interference. The bill does not charge that Miles made any such agreement with Claypole and Higgins, under whom the complainants claim, or that they gave an increased price for the land, relying upon any such expectation. On the contrary, Mr. Claypole says, no such promise was made, and that they did not pay for the lots under any expectation that the alley would be widened. Certainly, then, Claypole and Higgins could have no equitabie claim upon Miles to widen the alley, or to prevent his widening, and then contracting it again, at his pleasure. They could not claim the benefit of any promise or agreement he subsequently made to others.; and there certainly could be no propriety in their advancing such a claim. But the complainants do not occupy precisely this position. They have since purchased from Claypole and Higgins, and insist that they purchased after the alleged promises and agreements were made, and after the alley had been actually widened. If they *507 had alleged, in their bill, that they purchased and paid for their lots after Miles had widened the alley — after he had sold lots upon it thus widened — and after he had done other acts which showed an intention on his part to dedicate it at its increased width, then they would have presented a stronger claim for equitable interference in their behalf. But, at the time they purchased, the alley was not actually widened to Main street, and they do not allege that they paid for their lot under the expectation that it would he; nor do they say that Miles had done anything upon which they relied to manifest an intention of opening the alley sixteen feet wide. They have made no improvements ou their lots. It does not appear that they have done anything relying upon the declarations or acts of Miles as to opening or widening the alley.
I must confess I do not consider the complainants as occupying a very favorable position in the court. If they had purchased directly from Miles, and he had agreed to widen the alley, and had actually executed his agreement by widening it, they would have had some claim, in equity, to hold him where he had placed himself under his agreement. Although the court could not certainly have compelled him to execute such an agreement existing merely in parol, yet when once executed, the court would have prevented his retracting to the injury of one who had a moral claim upon him for its execution.
As the case has excited a very great interest, and the parties have incurred great expense in endeavoring to maintain their respective rights, I have examined carefully the whole evidence, that I might give an opinion as to whether, under the most favorable circumstances, the complainants could have any claim upon John Miles, or upon the defendants, who hold under him, to enjoin them from erecting the building in question.
Admitting, then, the position taken by the complainants’ counsel — that if they have shown that John Miles promised and agreed to open the alley through from Main *508 to Second street, and that if he has done acts which show an intention to dedicate the alley to such extent, they are entitled to an injunction to prevent the defendants from obstructing the alley, wherever it has thus been opened— have they proved such a case ? The burthen of proof is with the complainants. They are seeking to deprive the defendants of the use and enjoyment of the property, the title to which is indisputably in them. They should show a clear casé, free from all reasonable doubt.
The complainants produce a number of witnesses, who testify very positively to the declarations of Miles, made at the several public sales of the lots on the alley, and at other times, of his intention to open the alley sixteen feet wide. Some of them say he declared he would open it clear through from Main to Second street. Others testify that he said the alley was to be sixteen feet wide, without mentioning its termini.
Clement Rockhill, John Cobson, Paul A. Foram, and George Clift are very strong witnesses as to these declarations. But where there is contradictory testimony, the court cannot overlook the fact of witnesses being very greatly interested in the question at issue, and of their exhibition of feelings strongly enlisted in behalf of the party for whom they are called to testify. "Witnesses who occupy such a position, and exhibit such feelings, testifying to declarations and conversations which occurred eight or ten years ago, can hardly be expected to be as accurate in their testimony as disinterested witnesses. Mr. Mock-Mil is the owner of a lot in the alley. When he is asked if his property will not be enhanced in value, instead of answering the question, he objects, and after some difficulty, is brought to say, “ I suppose it will increase it a little — that is if I wanted to sell, — it would not increase it for me, only for accommodation.” To the question, whether he has contributed anything to carrying on this suit — he replies, “ I have not contributed anything; it is ■likely I shall, and every other good citizen of the town *509 ought to, or else he is no man.” He says he has not taken a deeper interest in the suit “ than every good citizen ought to.” Mr. Rockhill says he took no part in the attack upon the building just before the injunction was granted. It is proved that he was greatly excited at the time, and, with a pole in his hand, made common cause with the attacking party. A witness, under such circumstances, is not entitled to have the same weight given to his testimony as one who stands indifferent between the parties. I may say this without impeaching the integrity of Mr. Eockhill. The natural effect of such personal exciting causes is to warp the memory. Such witnesses do hut exhibit human nature, as we generally find it. There are exceptions to the general rule, but they are rare.
The defendants call witnesses who were present at the same sales, and heard the same declarations, and some of whom were purchasers at the sales. They put a different construction upon the declarations, and one consistent with the defendants’ answer. According to their recollection, Mr. Miles confined himself to that portion of the alley from the foot of the Barns lot to Second street, and declared his intention to he to open the alley, to that extent, sixteen feet wide. This intention he afterwards carried out. The witnesses say, if it had been understood that the alley was to be widened sixteen feet all the way through, the lots would have sold for as much again as they did. Others say they did not purchase because the alley was not extended out to Main street. But it is the acts of John Miles to which we must look as indices of his intention. His declarations are of no importance, except as they explain and give color to his acts.
As to these acts, the only inquiry material to settling this controversy is — what acts did John Miles do to show his intention to open to the width of sixteen feet that portion of the alley lying next to, and to the distance of one hundred and fifty-three feet from Main street? The fact, that he opened the alley all the way through from Main *510 to Second street, and then widened it sixteen feet for three hundred and sixty-nine feet, out of four hundred and twenty-two feet, and sold lots upon the alley, is some evidence of such intention. In the year 1847, he moved the fence, along the one hundred and fifty-three feet, for the distance of eighty-four feet below the ice-house, and left the space open between the smoke-house and the brick house, which is the particular spot of ground now in dispute. The ice-house has been filled up, and the fence where the house stood was placed back on the line of sixteen feet. Why was the fence, below the ice-house, moved in ? The defendants have attempted to show that it was done for Miles’ convenience mainly, and that it was used by his tenants. But it is very clear that, during all the time the fence has been moved in, the land thrown out has been used as part of the alley; and the fact, that by this removal of the fence, the alley, at this place, was made to correspond with the part toward Second street, is evidence that the fence was moved for that purpose. There is evidence that Miles said he moved the fence for the purpose, of widening the alley, and that, upon application being made to him to fill the ice-house, he declined, saying that it stood in the alley. But, on the other hand, George W. Thomson testifies that he heard Miles say he meant to tear down the ice-house, and build a kitchen there.
The evidence, with regard to the space between the brick house and smoke-house, is very different. Although, for most of the time since 1844, that space has been left open, Mr. Miles has used it for purposes, and asserted acts of ownership over it, during the whole period, inconsistent with an intention to make it a part of the alley. Allen Seeder, a witness called by the complainants, says, that he was a tenant of the brick house from 1849 until 1856; that when he moved there, there was no fence between the brick house and the smoke-house, and that the space was left open until he left, which was the first of *511 April, 1856. But on cross-examination, he says, that he used it all the time he was there for private purposes, and considered that he rented the privilege of it. Mr. Miles himself used it to keep his water-casks there and his coal-bins. The proof is clear that Mr. Miles and his tenants claimed and enjoyed the use of it. In the year 1847, one of the tenants put up a fence, by permission of Mr. Miles. Mr. Thomson, another tenant, claimed a right of way, and insisted upon having the fence down. He claimed it, not as a public highway, but as a private way. They had a kind of informal lawsuit before a justice of the peace and a jury, and Mr. Thomson’s claim was sustained. The fence stood for several years, and yet no one interfered with it on the ground of its being on the public alley. Gideon Lewis has been a tenant of the brick house for the last eighteen years. He says he has had the privilege of using the twenty-one feet space for private purposes, and considered that he rented that privilege. In addition to these facts, we have Miles, in 1832, putting up a brick building, which is altogether inconsistent with his entertaining any idea, at that time, of opening the alley to Main street. The smoke-house still stands on the eight feet line, although a building of but little value and easily removed. We can hardly conceive of a right existing to have the alley opened to Main street, and yet that this smoke-house should have been permitted to remain, when it constitutes so great an obstruction to the use of the way.
I do not see how any one can carefully examine this evidence without coming to the conclusion, either that John Miles did not intend to dedicate the twenty-one feet between the brick house and the smoke-house as part of the alley, or that the evidence leaves it in doubt whether such was, or was not, his intention. I do not think that the complainants have proved their case. The defendants have a title to this land. They cannot be deprived of that title by merely throwing a cloud upon it.
*512 The bill must be dismissed with costs. The expenses of the examination of the witnesses, who were re-examined without an order for that purpose, must not be included in the taxed bill, as their examinations were contrary to the practice of the court.